IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 1, 2023

**IN RE: GLENN B.[1] ET AL**

**Appeal from the Juvenile Court for Smith County**
**No. 2022-JV-125    Branden Bellar, Judge**

_____

**No. M2023-00096-COA-R3-PT**

_____

Mother appeals the termination of her parental rights to three of her children. The trial court found six grounds for termination: abandonment by failure to visit, abandonment by failure to support, abandonment by failure to provide a suitable home, substantial noncompliance with a permanency plan, persistent conditions, and failure to manifest an ability and willingness to assume custody. The trial court also found termination of Mother's parental rights to be in the best interests of the children. Mother raises procedural and substantive challenges to the trial court's decision. We affirm the judgment of the trial court terminating Mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

JEFFREY USMAN, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and CARMA DENNIS MCGEE, JJ., joined.

Jacquelyn M. Scott, Carthage, Tennessee, for the appellant, Erica B.

Whitney A. Mullinax, Carthage, Tennessee, Guardian ad Litem for the minor Children, Glenn B., Alexander B., and Ruth B.

Jonathan Skrmetti, Attorney General and Reporter; and Jordan K. Crews, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

_____

[1] "In cases involving the termination of parental rights, it is this Court's policy to remove the full names of children and other parties, to protect their identities." *In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at *1 n.1 (Tenn. Ct. App. May 15, 2023).

# OPINION

## I.

This appeal concerns the parental rights of Erica B. (Mother) to three of her children:[2] Glenn B., Alexander B., and Ruth B. (collectively "the Children"). On the date of trial, the Children were seven, five, and four years old respectively.

The case began on August 12, 2020, when the Tennessee Department of Children's Services (DCS) received a referral. The referrer alleged that "all of the adults in the home, with the exception of the maternal grandmother . . . used methamphetamine" and that an "unknown individual" overdosed and died, all in the presence of the Children. Police arrived the next day and interviewed Mother. According to DCS, Mother admitted during this interview to heroin use and acknowledged the death of the unknown individual. A drug screen indicated that Mother was actually using "opiates and oxycodone."

DCS facilitated a child and family team meeting on August 18, 2020. During this meeting, DCS sought to determine the identity of the Children's father because no father signed any of their birth certificates. Mother explained that her husband at the time, Larry S., who is also a registered sex offender, maintained legal rights to the Children. However, she also suggested that two other men, Nathan S. and William B., were putative fathers.[3] All three of these men executed valid surrender forms, relinquishing any parental rights they previously had to the Children. Thus, only Mother's parental rights are in dispute.

On August 21, 2020, DCS filed two documents in the Smith County Juvenile Court: a motion for an emergency protective order and a dependency and neglect petition. Regarding the request for an emergency protective order, DCS alleged that the Children were likely dependent and neglected and could face "severe and irreparable harm" if they remained in Mother's immediate custody. The trial court granted that motion. Madison Coen, one of the DCS family services workers who had been assigned to Mother's case, has stated that this began the "noncustodial case," meaning the Children were placed with family members instead of DCS assuming custody.

Meanwhile, in its dependency and neglect petition, DCS recounted most of the same facts outlined above, stated that a dependency and neglect adjudication would be in the Children's best interest, and argued that the Children faced a real risk of harm if not removed from Mother's custody. The court found that the Children to be dependent and neglected on December 22, 2020. In the same order, however, the trial court granted

---

[2] Mother's fourth child is not identified in the termination petition.

[3] DNA test results indicate that Nathan S. was very likely the biological father of at least two of the Children.

Mother a trial home visit, which would maximize her time with the Children.

It appears that the Children lived with Mother for a significant period of time between December 2020 and April 2021, though the record contains irregularities.[4] Heather Huffines of DCS took over Mother's case on February 5th, and she recounted all of her efforts to preserve the familial relationship between Mother and the Children. Ms. Huffines explained that she began revising her proposed permanency plan and conducted a video visit with Mother and the Children. According to Ms. Huffines, DCS received additional referrals about Mother on February 8th and February 9th. The former objected to the cleanliness of Mother's home and prompted DCS to "request[] Mother make efforts to clean up the home and set up a home visit for February 10 to confirm she had cleaned up the home." The latter indicated Mother was still using drugs, so DCS asked Mother to undergo a urine drug screen. Mother tested positive for buprenorphine.[5]

Ms. Huffines conducted a full family visit on February 10, 2021. Numerous topics were discussed at this meeting, including the Children's school arrangements and daycare options. Mother also alerted Ms. Huffines that she was likely to be evicted by her landlord. Ms. Huffines told Mother that "DCS could provide [financial assistance] in paying the first month's rent on a new place for the family to live," and requested Mother sign a release so that Multi-Agency Collaboration (MAC) Services could intervene and assist her in finding a suitable living arrangement. Mother signed the release and Ms. Huffines filed a MAC request on the same day. Mother's efforts to adequately address the housing problem, however, tailed off.

Ms. Huffines attempted in-person home visits with Mother on February 22nd and 25th, March 12th and 18th, and April 8th, 2021, but Mother was absent from the home during the scheduled times. MAC services placed Mother in contact with Omni Community Health for treatment, but Mother did not disclose that information to Ms. Huffines when asked about it on February 23, 2021. On March 19, 2021, Ms. Huffines discovered that Mother had been referred to Omni Community Health, and she reached out to discuss Mother's case. An Omni Community Health representative informed Ms. Huffines that Mother "missed sessions with the provider." On March 23, 2021, another representative told Ms. Huffines that Mother missed more sessions, though she "had

_____

[4] According to an affidavit of reasonable efforts entered as an exhibit at trial without objection, Mother "split the children up and let them [live] with various relatives, none of whom could be approved by the department" at some point during the trial home visit. The record does not contain approximate dates for when the Mother split the Children up, but the Department maintains that this action went "[a]gainst the advice of the department."

[5] The record contains contradictory evidence on Mother's use of buprenorphine. Ms. Coen testified at the final hearing in this case that Mother did not have a prescription for buprenorphine. However, Ms. Huffines writes in her affidavit of reasonable efforts that Mother was prescribed buprenorphine, at least at one time.

reported illness and had . . . rearranged [sessions] to be by video until [Mother] submitted a negative Covid test." Ms. Huffines and Omni Community Health worked together on March 31st, April 1st, April 5th, and April 7th to promote Mother's continued progress. Despite this, Omni Community Health discharged Mother from its services on April 7th "due to non-compliance." The record indicates Mother completed only one session with Omni Community Health in the two months following her referral by MAC services.

Mother did complete one in-person visit with Ms. Huffines between February 10 and April 14, 2021. On March 24, 2021, Ms. Huffines visited Mother and the Children and learned that Mother had parted ways with Larry S. Mother had become romantically involved with Chad D., and he tested negative for any drugs during a voluntary urine screen. Mother still tested positive for buprenorphine, although for only an amount "which she is prescribed." Mother stated that she was set to be evicted by court order on April 5th, but had found a "trailer" in Pleasant Shade to live in and planned to move in by April 1, 2021.

On April 14, 2021, Ms. Huffines received a series of worrisome phone calls from Mother. According to her affidavit,

> [Mother] was crying. She stated that she was in a lot of pain in her arm, home alone with the kids, needed to go the emergency room and didn't know what to do. [Ms. Huffines] discussed that it sounded like her only option was to take the kids to the hospital with her. [Mother] stated that they would act up. [Ms. Huffines] discussed that it still sounded like her only option. [Ms. Huffines] received another call from [Mother] a few minutes after hanging up. [Mother] was still crying. [Mother] asked if DCS was going to take the kids from her if she didn't have somewhere to live after her eviction on [April 17, 2021.[6]] [Ms. Huffines] discussed if they had somewhere to live that would be different from them being homeless. [Ms. Huffines] discussed this was why [she] had been asking for regular updates on the status of them moving so a shelter could be set up if needed. [Ms. Huffines] asked if [Mother] needed [her] to set up a shelter for them. [Mother] stated that she did.

Within approximately an hour after Ms. Huffines received these phone calls, she arranged for Mother to receive temporary housing through the Cookeville Rescue Mission. Mother's stay was set to begin on April 17, 2021.

Ms. Huffines also spoke to the Guardian ad litem (GAL) after receiving these worrisome phone calls and shared details of Mother's rapidly deteriorating housing

---

[6] The record does not indicate how or why Mother's plan to live in Pleasant Shade failed or whether her eviction date was moved to April 18, 2021.

- 4 -

situation. The GAL immediately filed an emergency motion, requesting the trial court terminate Mother's trial home visit. The trial court held a hearing on the GAL's motion on April 15, 2021. Though DCS did not oppose the motion, Ms. Huffines informed the trial court of her coordinated plan with Mother to "set the family up with the Cookeville Rescue Mission." Since Mother and Ms. Huffines had created what seemed to be a viable plan, the trial court denied the GAL's motion.

Mother inquired about whether Chad D., her boyfriend, could also live in the shelter with the family, and Ms. Huffines indicated men might not be allowed. When Ms. Huffines inquired with Nashville Rescue Mission about that same question, the shelter informed Ms. Huffines that the "men's campus . . . had to be reserved separately." Ms. Huffines provided Mother with the information needed to reserve space for Chad D. at the shelter. Ms. Huffines reserved spaces for Mother and the Children at both the Cookeville and Nashville missions. Mother continued to search for other places to live, and, despite Ms. Huffines's attempts to dissuade her, Mother "declined to go to [either] shelter." Mother reported plans to "place the children different places," separated the children, and left them with "various relatives," stating she intended to relinquish custody to these individuals, who had not been approved by DCS.

Thereafter, DCS filed its own emergency motion with the trial court seeking to terminate Mother's trial home visit. The trial court granted DCS's motion on April 19, 2021, explaining that it made its decision based on Mother's "homelessness and failure to cooperate with [DCS's] attempts to help the family obtain shelter." The trial court also noted that Mother's circumstances "pose an immediate threat to the [Children's] well-being, and that there is no less drastic alternative which could reasonably and adequately protect the [Children's] health and safety." At this point, DCS assumed custody of the Children.

After Mother's trial home visit was terminated, DCS and Mother finalized her permanency plan on May 10, 2021. Accounting for its later amendments, the plan placed the following compliance obligations on Mother: (1) obtain an alcohol and drug assessment, "be open and honest with the assessor," and "follow all treatment recommendations and … participate in aftercare" about the same; (2) undergo and pass random drug screens, "abstain from alcohol abuse, using illicit drugs and/or non-prescribed medications," refrain from associating with individuals who "are actively under the influence or using or selling drugs," and report any relapses that occur; (3) complete a one-year rehabilitation program; (4) "fully participate" in a psychological evaluation, and "obtain and maintain mental health stability" by abiding by all of the recommendations arising "from the results of the evaluation such as therapy, case management and[] possibly medication management"; (5) improve upon communication with the Children, prevent them from being in dangerous situations involving other people or "domestic violence" situations, and "provide age appropriate discipline"; (6) communicate with DCS assessors "within 24 hour[s] of contact" and through regularly scheduled appointments "until

- 5 -

successfully released by the service provider"; (7) provide proof of some form of housing, whether that be through home ownership or a lease, and "maintain minimal housekeeping standards"; (8) protect the home from "illegal activity" through measures such as having residents complete DCS background checks; (9) "follow all court orders regarding visitation"; (10) diligently attend foster care visits or, if late, notify DCS and the foster parent(s); (11) pay child support as ordered and voluntarily if needed for things like "clothing, diapers, school supplies, etc."; and, (12) otherwise abide by the requirements of the plan by "promot[ing] a positive environment" during all interactions with the Children.

The GAL and DCS maintain that Mother's last recorded visit with the Children of any kind occurred on September 10, 2021. Ms. Coen explained at the final hearing in this case that the Department sought to facilitate at least four visits between November 12 and November 30, 2021, but that none occurred. Mother did attempt to attend a visit on December 1, 2021, but tested positive for "methamphetamines, amphetamines, and opiates."

By this point, DCS shifted from trying to schedule in-person visits to trying to assist Mother's efforts to enter an inpatient drug treatment program. Mother attempted, but ultimately failed, to enter inpatient treatment at Bradford Health Services, which reported that Mother could not be reached. A new case manager, only described in the record as CM White, allegedly called Mother on December 9, 2021, to inquire about why Mother had not entered the Bradford program. During that call, Mother reported that "she had overdosed [on] methamphetamine laced with Fentanyl." The following day, Mother reported to the new case manager that she was attempting to enter a program at Mirror Lake Recovery Center. Finally, on December 27, 2021, Mother reported that she had attended an intake meeting at The Next Door, a rehabilitation center, on December 20th. However, when the new case manager "attempted to confirm that Mother was inpatient at The Next Door" on January 12, 2022, "the facility denied that Mother was a patient there." Mother finally admitted herself to The Next Door program on January 21, 2022. However, she reported to another case manager, Destiny Harbaugh, on February 16, 2022, that she left The Next Door because the program "violated her rights." Mother told Ms. Harbaugh on that same day that "she was homeless but that she was sober."

While Mother was attempting to enter an inpatient treatment program, the GAL filed a request to suspend Mother's visitation rights. The record does not appear to contain the GAL's motion, any response in opposition from Mother, the corresponding order, or Mother's motion to have the order set aside. Instead, the best explanation found in the record is Ms. Coen's final hearing testimony. On that date, she explained that the GAL filed the motion after Mother failed to visit the Children at any point after September 10, 2021. The trial court granted the GAL's request on February 25, 2022. Mother's counsel immediately filed a motion to set aside the trial court's order. According to the trial court's order, however, the "motion was never heard due to [Mother's] failure to appear in Court. [Mother], despite the bes[]t efforts of her counsel, never attempted to have the Order set

aside." All parties agree that, since Mother never appeared to request the order be set aside, Mother has not been permitted to visit the Children since January 2022.

Ms. Harbaugh also sought to assist Mother in meeting the terms of her permanency plan. She called Mother on February 24 and explained to her the terms of the plan. Mother reported during the same call that she "was homeless and staying at Compassionate Hands at night" and "that she had applied [for a job] at FedEx and would be starting . . . to work with them on Monday." Between this date and March 11, 2022, Mother could not be reached. Mother reportedly told Ms. Harbaugh on March 11th that "she had been kidnapped and that's why nobody could reach her."

DCS filed a petition in the trial court to terminate Mother's parental rights to the Children on May 17, 2022. In its petition, DCS alleged that six grounds warranted terminating Mother's rights: (1) abandonment by failure to visit, (2) abandonment by failure to support, (3) abandonment by failure to provide a suitable home, (4) substantial noncompliance with the permanency plan, (5) persistent conditions, and (6) failure to manifest an ability or willingness to assume custody. It also argued that terminating Mother's parental rights was in the Children's best interests. While Glenn B. and Ruth B. were placed in pre-adoptive homes, Alexander B. was placed in a foster home. They were separated from each other "due to their behavioral issues," but DCS contends that each did well despite their separation and that each had been the topic of adoption discussions.

Ms. Coen informed Mother that she had been assigned to her case on July 5, 2022. Ms. Coen testified that she experienced significant difficulties while trying to communicate with Mother, due to Mother's homelessness. However, she received a new, working telephone number for Mother on August 15, 2022. Ms. Coen called Mother that same day and went over the permanency plan. According to Ms. Coen, Mother "reported that she was still considering surrendering [the Children]," but had not made a decision. Mother did not provide Ms. Coen with her address despite repeated requests being made.

Thereafter, Mother's case was transferred to Michael Hesson, another DCS family services worker. Mr. Hesson also sought information about Mother's address on multiple occasions with no success. Mother only acknowledged Mr. Hesson on two of the eight occasions he tried to contact her. On October 5, 2022, he called Mother after she missed a family team meeting. Mother objected to this, stating "she was not invited," but Mr. Hesson provided Mother with documentation to the contrary. Then, on October 25, 2022, Mother and Mr. Hesson briefly discussed one of the Children's medical needs. The last indication in the record of Mother's communications with DCS is that Ms. Coen testified that a copy of Mother's permanency plan was sent to her via email on November 16, 2022.

The trial court held its final hearing on November 21, 2022. DCS began by entering numerous documents into evidence. Ms. Coen testified at length during this hearing. Ms. Coen provided some details on the whereabouts and statuses of each of the Children. She

testified that Glenn B. was placed in a StepStone foster home, while Alexander B. and Ruth B. were placed in Wayne Provision foster homes. Though Ms. Coen indicated that Alexander B. and Ruth B. were previously situated in other placements before their current Wayne Provision placements, the record does not indicate the exact dates when they were relocated to their current placements. She also explained that "great behavioral concerns" warranted separating the Children while in DCS custody. While the behaviors are not explicitly defined in the record, Ms. Coen did testify that all three Children have been prescribed some form of medication and participate in medication management. Additionally, she mentioned that Glenn B. has a vision deficiency that requires glasses and that Ruth B. attends speech therapy.

Ms. Coen also addressed each of DCS's grounds for terminating Mother's parental rights. She started with the first two of Mother's abandonment grounds: failure to visit and failure to support. Ms. Coen identified the four months preceding the filing of the petition on May 17, 2022, as the relevant four-month period for examination of Mother's conduct, and testified that Mother did not visit or support the Children during that time. She acknowledged that Mother was under a non-visitation order during part of that time, but contended that "[a]ll Mom would have to do was come to court and find out what the stipulations were to get visitation back, and she did not show [up] . . . for any court." Ms. Coen further testified that she believed Mother was not incarcerated or hospitalized during this period, and that she was "able-bodied and capable of working and paying child support." Ms. Coen noted that Mother had completed successful visits "both before and after the unsuccessful trial home visit," but did not visit the Children at any point after September 2021.

Ms. Coen also testified about Mother's alleged abandonment by failure to provide a suitable home, the third ground supporting termination. DCS selected November 12, 2021, to March 12, 2022, as the four-month period to examine for this ground because that represented a "four-month period following removal of the children to DCS custody." Ms. Coen explained that DCS tried to prevent removal, and "made continuous and ongoing efforts to reunify the mother and the children" on many occasions. These efforts included, but were not limited to: scheduling child and family team meetings as well as supervised visits, working to provide Mother with transportation to scheduled visits, assisting Mother in her plans to attend a drug treatment program, and discussing Mother's obligations under the permanency plan. Despite all of these instances, she opined that Mother did not make reasonable efforts to provide the Children with a suitable home. As evidence to support her opinion, Ms. Coen emphasized that: (1) Mother did not complete the action steps of her permanency plan, (2) did not visit the Children during the relevant four-month period, (3) failed a drug screen, (4) left treatment despite being advised otherwise by medical professionals, (5) and continued drug use after leaving treatment.

Ms. Coen then addressed the fourth ground: Mother's alleged substantial noncompliance with the permanency plan. Although Mother was invited to participate in

the creation of her plan and informed of her obligations, Ms. Coen explained, Mother completed "nothing" in it. She testified that Mother failed to complete the following steps: (1) complete a psychological examination and its associated follow-ups, (2) pass an alcohol and drug assessment and its associated follow-ups, (3) demonstrate sobriety and submit to drug screenings, (4) participate in parenting education, (5) provide proof of income, (6) visit with the Children, and (7) procure safe and stable housing.

Regarding the fifth ground of persistent conditions, Ms. Coen testified that, while the Children had been in DCS custody for eighteen months, Mother had not addressed the two primary concerns that warranted the Children's removal from her custody: "[l]ack of stable housing and . . . drug use." At this point, DCS entered into evidence results from several failed drug screens. Ms. Coen stated that Mother tested positive for: (1) buprenorphine on March 24, 2021; (2) buprenorphine on April 15, 2021; and, (3) amphetamines and opiates on December 1, 2021. She also explained that DCS does not know where Mother lived after her April 2021 eviction or where she was living at the time of trial. Despite this, Ms. Coen explained, Mother "reported herself to be homeless." When asked about the Children's well-being if Mother's rights were maintained, Ms. Coen testified that she believed termination was the correct decision because, since November of 2020, Mother "continue[d] to use drugs . . . struggled with getting housing . . . [and] has not completed any of her assessments on the perm[anency] plan."

Ms. Coen then testified about the final ground for termination, Mother's alleged failure to manifest a willingness and ability to assume custody over the Children. She explained that DCS expects parents to keep in contact with the department, observe the requirements of their permanency plans, visit their children, pay support obligations, and establish a safe living space. Ms. Coen opined that Mother did not meet any of these expectations. She also believed that returning the Children to Mother's custody would "pose a risk of substantial harm to the [Children's] physical and psychological welfare" because "[t]hey have not seen their mother in over a year. They are becoming bonded with their foster parents. So, separating them from that would be traumatic."

Finally, Ms. Coen spoke about the Children's best interests. She stated the following facts in support of her opinion that termination was in the Children's best interests: (1) the children are bonded with their foster parents and "haven't seen their mother in over a year," so changing their current caregivers would have negative "[m]ental and emotional" impacts on the Children; (2) Mother has not maintained housing; (3) Mother has not "seen her children since September of 2021"; (4) the Children have also developed positive relationships with "[t]heir extended family, their foster siblings, [and] their teachers"; (5) Mother continues her drug use, as evidenced by multiple failed drug screens; (6) Mother failed to take advantage of DCS's efforts to assist her in entering a shelter and inpatient drug treatment programs; (7) Mother has not assisted the Children with any of their "medication management" issues and counseling; and, (8) DCS representatives took part in conversations with Mother "in which she was incoherent and

mentally unstable." In total, Ms. Coen agreed with DCS's counsel that at least seventeen listed best interest factors favored termination, as well as the five following unlisted factors: (1) a general failure to show genuine interest in the Children's welfare, (2) poor lifestyle choices, (3) the adoption prospects for each child, (4) each child's positive relationship with their foster families, and (5) the need for permanency.

Ms. Coen conceded during cross-examination that she lacked knowledge of Mother's employment status, specific job skills, and educational background. Mother's counsel also attempted to discredit DCS's communications with Mother, and emphasized that Mother never received a physical copy of her permanency plan. In responding to the latter point, Ms. Coen indicated that Mother had been informed of her responsibilities under the plan on multiple occasions. Mother also established that, while each of the Children has been placed in some form of foster care or pre-adoptive environment, Ms. Coen was unsure if the Children would ever be adopted by their respective placements. Additionally, Mother's counsel questioned Ms. Coen about Mother's admittance to The Next Door program. Ms. Coen explained that "typically" programs like The Next Door would complete a drug and alcohol assessment, but that she was unaware if Mother's previous caseworker ever requested copies or received a release authorizing the transfer of any such assessment.

After Ms. Coen's testimony, the trial court then heard from Ruth B.'s foster father. He described Ruth B.'s placement as a "thriving" one "to say the least. She is bonded . . . She's doing fantastic." Ruth B.'s foster father confirmed that Ruth B. calls him "Daddy," calls his wife "Mama," and calls his parents "her grandparents." He concluded his testimony by agreeing that, "in the event that Ruth became available for adoption" and he adopted her, he would "continue to facilitate relationships with [Ruth B.'s] siblings."

Once DCS concluded its proof, the trial court gave Mother the option to testify via telephone. Though DCS suggested such testimony would be "unorthodox," it did not object to the possibility because Mother explained that she did not have transportation and could not arrive at her hearing on time.[7] Mother ultimately did not testify.

The trial court granted DCS's petition to terminate Mother's parental rights. The trial court concluded that DCS met its burden of establishing all six grounds of termination listed in the termination petition by clear and convincing evidence. Moreover, the trial court found that all seventeen of the listed best interest factors relied upon by DCS, as well as the five non-listed best interest considerations, favored termination.

---

[7] Despite Mother's inability to physically attend, the trial court ensured that Mother was virtually present via a teleconference for the entirety of her final termination hearing. Mother has not suggested on appeal that she was denied due process as a result of not attending the hearing in person.

Mother now appeals to this Court, raising procedural and substantive objections to the trial court's order. Mother argues that the trial court's order contains procedural deficiencies in that findings of fact are not listed in the section for ground six or throughout the best interest section. But even if the trial court's order meets the procedural requirements of the termination statute, Mother still contends that the trial court erred when it concluded that at least one ground supported termination of Mother's parental rights and that termination was in the Children's best interests. Concerning Mother's procedural argument, DCS defends the trial court's order as sufficient in its findings. Additionally, both DCS and the GAL support the trial court's final order on the merits.

## II.

Mother contends that the section of the trial court's order addressing ground six, failure to manifest an ability and willingness to assume custody, and the section addressing the Children's best interests violate Tennessee Code Annotated section 36-1-113(k). Her argument is predicated upon a purported failure to make adequate findings of fact in support of the trial court's conclusion as to both this ground for termination and the best interest factors. DCS insists that the trial court's findings of fact and conclusions of law are adequate to support its conclusions, noting that additional factual findings are delineated in other portions of the trial court's order.

Tennessee Code Annotated section 36-1-113(k) states, "The court shall enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." (effective July 1, 2021, to Jun. 30, 2022).[8] Given its mandatory language, courts must follow its requirements even if not invoked by the parties. *In re Isaiah D.*, No. W202101168COAR3PT, 2022 WL 16826745, at *3 (Tenn. Ct. App. Nov. 9, 2022); *In re Adoption of Muir*, No. M2002-02963-COA-R3CV, 2003 WL 22794524, at *3 (Tenn. Ct. App. Nov. 25, 2003) ("Thus, trial courts must prepare and file written findings of fact and conclusions law with regard to every disposition of a petition to terminate parental rights, whether they have been requested or not."); *see also In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004) ("A trial court's failure to comply with Tenn. Code Ann. § 36-1-113(k) fatally undermines the validity of a termination order.")

Mother contends that the sections concerning her alleged failure to manifest an ability and willingness to assume custody and the Children's best interests do not have detailed factual findings set forth within them separately. Mother's argument is, essentially, that the trial court must restate its relevant findings at each portion of the order where they are implicated or risk vacatur, even if sufficient findings of fact are stated in other portions of the order.

---

[8] "This court applies the versions of the parental termination statutes in effect on the date the petition was filed." *In re J.S.*, No. M2022-00142-COA-R3-PT, 2023 WL 139424, at *6 (Tenn. Ct. App. Jan. 10, 2023) *perm. app. denied* (Tenn. April 4, 2023).

- 11 -

We believe this is a misreading of the statutory scheme. Section 113(k) requires a trial court to "make[] specific findings of fact," but does not indicate *where* a court should situate those factual findings within its final order. *In re Adoption of C.A.M.*, No. W2008-02003-COA-R3-PT, 2009 WL 3739447, at *7 (Tenn. Ct. App Nov. 9, 2009) ("While the termination statutes require . . . specific findings of fact, there is no authority that the findings must be in a particular section of the trial court's order.") "So long as the trial court's written order contains findings of fact of requisite specificity that show that termination is in the child's best interest, the fact that the findings are not set out in the 'best interest' section of the order does not render the order insufficient." *Id.* Here, the trial court outlined specific "findings of fact" made numerous factual findings throughout its written order. *See In re Zoey L.*, No. E2020-01250-COA-R3-PT, 2021 WL 3520509, at *5 (Tenn. Ct. App. Aug. 10, 2021) (upholding trial court's order after vacating and remanding on a prior appeal where "[f]ollowing remand, the trial court prepared and entered [an] Amended Final Judgment . . . . [which] includes a section entitled 'Findings of Fact and Conclusions of law' . . . . [and] specifically addresses the best interest factors"). In other words, while doing so helps facilitate appellate review, a trial court is not required to restate the relevant factual findings within the discussion of each and every ground and best interest factor to comply with section 113(k) so long as the order contains sufficient findings to explain and support the trial court's conclusions, allowing for meaningful review of the trial court's decision. The trial court in the present case expressly stated its conclusions as to the sixth ground for termination and all of the best interest factors in addition to expressly noting non-statutory grounds that the trial court considered. We conclude that the trial court's findings of fact in this case are sufficient and find no reversible error in the trial court's manner of constructing its order in the present case.

## III.

Turning to the grounds for termination of parental rights, we note that parents have a fundamental constitutional interest in the care and custody of their own children. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). This fundamental interest is "far more precious than any property right." *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982)). "[P]ublic policy strongly favors allowing parents to raise their biological or legal children as they see fit, free from unwarranted governmental interference." *In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010). However, a parent's rights are not absolute and may be terminated on clear and convincing evidence that statutory grounds for termination exist and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c)(1)-(2); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013).

In a termination of parental rights case, we review a trial court's findings of fact de novo on the record with a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596 (citing Tenn. R. App. P. 13(d)). "In light

of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d at 596-97). The grounds for termination and the determination that termination is in the child's best interest must be established by clear and convincing evidence, that is, evidence that "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts" and that "eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596; *see* Tenn. Code Ann. § 36-1-113(c). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

IV.

The trial court found that clear and convincing evidence established six grounds for termination: abandonment by failure to visit, abandonment by failure to support, abandonment by failure to provide a suitable home, substantial noncompliance with a permanency plan, persistent conditions, and failure to manifest an ability and willingness to assume custody. On appeal, Mother does not challenge all of the grounds for termination. Nevertheless, it is incumbent upon this court to address each ground for termination pursuant to the Tennessee Supreme Court directive to this court to "review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26.

A. Abandonment by Failure to Visit

The trial court found that clear and convincing evidence established that Mother abandoned the Children by failure to visit. *See* Tenn. Code Ann. § 36-1-113(g)(1) (effective July 1, 2021 to Jun. 30, 2022). Abandonment occurs when a parent fails to visit his or her child "[f]or a period of four (4) consecutive months immediately preceding" the filing of the termination petition. Tenn. Code Ann. § 36-1-102(1)(A)(i) (effective May 9, 2022 to June 30, 2022). Visitation must be more than just token visitation, *i.e.*, visitation that "under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C), (E). Lack of willfulness is a defense to the ground of abandonment by failure to visit, but "[t]he absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure." Tenn. Code Ann. § 36-1-102(1)(I). Rule 8.03 provides that "[i]n pleading to a preceding pleading, a party shall set forth affirmatively facts in short and plain terms relied upon to constitute . . . any . . . matter

constituting an affirmative defense."

DCS filed the termination petition on May 17, 2022. None of the parties to this appeal dispute the fact that Mother did not visit the Children at any point between January and May of 2022. Mother did not plead the absence of willfulness. Where an affirmative defense has not been pleaded, that failure to plead generally results in waiver of the affirmative defense. *See, e.g., Branch Banking & Trust Co. v. Hill*, 582 S.W.3d 221, 233 (Tenn. Ct. App. 2019) (quoting *ADT Sec. Servs., Inc. v. Johnson*, 329 S.W.3d 769, 778 (Tenn. Ct. App. 2009)). Mother does not contend that this issue was tried by consent. Nor does the record reflect that the affirmative defense of willfulness was tried by either express or implied consent.[9] Accordingly, we find no error in the trial court's conclusion that DCS established by clear and convincing evidence the ground for termination of failure to visit.

### B. Abandonment by Failure to Support

The trial court found that clear and convincing evidence established that Mother abandoned the Children by failure to support. *See* Tenn. Code Ann. § 36-1-113(g)(1). Failure to support occurs when a parent fails to support his or her child "[f]or a period of four (4) consecutive months immediately preceding" the filing of the termination petition. Tenn. Code Ann. § 36-1-102(1)(A)(i). Failure to support ground is defined as "the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period." Tenn. Code Ann. § 36-1-102(1)(D). Support must be more than just token support, which is support that "under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102 (1)(B). "The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure." Tenn. Code Ann. § 36-1-102(1)(I).

DCS filed the termination petition on May 17, 2022. None of the parties to this appeal dispute the fact that Mother failed to provide any support to the Children at any point between January and May of 2022. Mother argues on appeal that DCS failed to establish that Mother had an ability to pay and, accordingly, to prove that Mother's failure to support was willful. Problematically, Mother did not plead the absence of willfulness. Where an affirmative defense has not been pled, that failure to plead generally results in

---

[9] Tennessee Rule of Civil Procedure Rule 15.02 provides, in part, that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." *See, e.g., Branch Banking & Trust Co.*, 582 S.W.3d at 236 (stating that implied consent arises from the parties and trial court understanding something to be at issue and actually litigating it); *McLemore v. Powell*, 968 S.W.2d 799, 803 (Tenn. Ct. App. 1997) (noting that "[i]mplied consent hinges on the issues that were actually litigated by the parties").

waiver of the affirmative defense. *See, e.g., Branch Banking & Trust Co.*, 582 S.W.3d at 233 (quoting *ADT Sec. Servs., Inc.*, 329 S.W.3d at 778). Mother does not contend that this issue was tried by consent. Nor does the record reflect that the affirmative defense of willfulness was tried by either express or implied consent. Accordingly, we find no error in the trial court's conclusion that DCS established by clear and convincing evidence the ground for termination of failure to support.

### C. Abandonment by Failure to Provide a Suitable Home

The trial court found that clear and convincing evidence established that Mother abandoned the Children by failure to provide a suitable home. *See* Tenn. Code Ann. § 36-1-113(g)(1). The General Assembly has delineated the ground for termination of abandonment by failure to provide a suitable home as follows:

> (1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> . . .
>
> (ii)(*a*) The child has been removed from the home or the physical or legal custody of a parent . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;
>
> (*b*) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
>
> (*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the

- 15 -

department;

Tenn. Code Ann. § 36-1-102(1)(A).

A suitable home is more than just an adequate physical space. *In re Roger T.*, No. W2014-02184-COA-R3-PT, 2015 WL 1897696, at \*8 (Tenn. Ct. App. Apr. 27, 2015). "A suitable home for purposes of termination of parental rights is not merely a solidly built structure." *In re Jonathan F.*, No. E2014-01181-COA-R3-PT, 2015 WL 739638, at \*12 (Tenn. Ct. App. Feb. 20, 2015). It must be a safe and stable environment in which a child can live with "the presence of a care giver who can supply the care and attention [a child] needs." *In re Malaki E.*, M2014-01182-COA-R3-PT, 2015 WL 1384652, at \*9 (Tenn. Ct. App. Mar. 23, 2015) (quoting *In re A.D.A.*, 84 S.W.3d 592, 599 (Tenn. Ct. App. 2002)). "[A] home may be rendered unsafe and unsuitable by the conduct of its occupants." *In re Kayla B.*, No. E2016-01192-COA-R3-PT, 2017 WL 438622, at \*6 (Tenn. Ct. App. Feb. 1, 2017) (quoting *In re Joshua S.*, No. E2010-01331-COA-R3-PT, 2011 WL 2464720, at \*18 (Tenn. Ct. App. June 16, 2011)). For example, to be suitable, the home needs to be free of illegal drugs. *See, e.g.*, *In re Krisley W.*, No. E2022-00312-COA-R3-PT, 2023 WL 2249891, at \*6 (Tenn. Ct. App. Feb. 28, 2023); *In re PrinceKenyan F.*, No. M2020-01306-COA-R3-PT, 2021 WL 3855713, at \*5 (Tenn. Ct. App. Aug. 30, 2021); *In re Jayda J.*, No. M2020-01309-COA-R3-PT, 2021 WL 3076770, at \*23 (Tenn. Ct. App. July 21, 2021). Furthermore, living under circumstances of homelessness does not provide a safe and stable home environment for a child. *See, e.g.*, *In re Jaxson F.*, No. E2023-00326-COA-R3-PT, 2023 WL 7179319, at \*5-6 (Tenn. Ct. App. Nov. 1, 2023) (noting Mother's homelessness in upholding the trial court's determination as to the failure to provide a suitable home ground); *In re Daniel B.*, No. E2019-01063-COA-R3-PT, 2020 WL 3955703, at \*5 (Tenn. Ct. App. July 10, 2020) ("By the time of trial, Mother was no closer to providing a suitable home than when the children were removed from her custody. She was homeless.").

To establish this ground, "DCS must make 'reasonable efforts' to assist the parents by doing more than simply providing a list of service providers." *In re Masson S.*, E2021-01196-COA-R3-PT, 2022 WL 17104403, at \*5 (Tenn. App. Nov. 22, 2022), *no perm. app. filed*. DCS must use its resources to assist parents, but its efforts need not be Herculean. *Id.*; *In re Jamarcus K.*, No. M2021-01171-COA-R3-PT, 2022 WL 3755383, at \*8 (Tenn. Ct. App. Aug. 30, 2022), *perm. app. denied* (Tenn. Sept. 27, 2022); *In re Lily C.*, No. M2021-00885-COA-R3-PT, 2022 WL 2301598, at \*6 (Tenn. Ct. App. June 27, 2022), *perm. app. denied* (Tenn. Sept. 19, 2022). "Although section 36-1-102(1)(A)(ii)(c) requires DCS to make reasonable efforts towards the establishment of a suitable home for 'a period of four (4) months following the physical removal' of the child, 'the statute does not limit the court's inquiry to a period of four months immediately following the removal.'" *In re Masson S.*, 2022 WL 17104403, at \*5 (quoting *In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at \*13 (Tenn. Ct. App. Dec. 15, 2016)).

- 16 -

The trial court analyzed a four-month period spanning November 2021 through March 2022. Mother conceded to DCS that, during that period, she overdosed on methamphetamine laced with fentanyl. She has also tested positive for drugs on other occasions. The trial court made factual determinations, which are supported by the record, that Mother was continuing to abuse drugs and that she was homeless, during the four-month period as well as beyond that time.

DCS provided evidence that it attempted to help Mother remedy her substance abuse problems. Mother failed, despite DCS's constant communication and willingness to provide additional resources, to complete inpatient treatment during this period. Between Bradford Health Services, Mirror Lake Recovery Center, and The Next Door, Mother visited but failed to complete programming offered by three different recovery services during the relevant time period. At every step of the way, DCS representatives repeatedly contacted Mother, offering to assist. With regard to housing, DCS had previously tried, prior to the four-month period, to procure mother shelter at multiple recuse missions, and Mother declined to attend any of them. One of them she declined because it did not appear that her boyfriend could also live there with her in the same living space, though DCS did identify an affiliated housing location for Mother's boyfriend. In responding to DCS's subsequent inquiries, Mother kept insisting that she had leads on housing. A DCS case worker told Mother that the department could help her with making rent payments. Mother failed repeatedly to follow up or provide information to DCS, creating challenges for DCS in maintaining effective communication with her and addressing her housing instability. The trial court concluded that DCS "went well above and beyond reasonable efforts." The trial court determined that Mother failed to make reasonable efforts to provide a suitable home and DCS's efforts were equal to or exceeded Mother's efforts. We find no error in the trial court's conclusion that DCS established by clear and convincing evidence the ground for termination of parental rights based upon failure to provide a suitable home.

## D. Substantial Noncompliance with the Permanency Plan

The trial court found that clear and convincing evidence established that Mother failed to substantially comply with her permanency plan. A ground for termination exists where clear and convincing evidence shows that "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan . . . ." Tenn. Code Ann. § 36-1-113(g)(2). This ground requires the responsibilities as outlined by the plan to be "reasonable and related to remedying the conditions which necessitate[d] foster care placement." *In re Carrington H.*, 483 S.W.3d at 537 (quoting *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002)). The court must not merely "count[] up the tasks in the plan to determine whether a certain number have been completed." *In re Carrington H.*, 483 S.W.3d at 537. Substantial noncompliance "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Instead, the parent's noncompliance must be "substantial in light of the degree of noncompliance and the

importance of the particular requirement that has not been met." *Id*. "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *Id*. Whether noncompliance is substantial is a question of law reviewed de novo. *In re Ethan W.*, No. M2021-01116-COA-R3-PT, 2023 WL 415999, at *6 (Tenn. Ct. App. Jan. 26, 2023) (citing *In re Valentine*, 79 S.W.3d at 548), *perm. app. denied* (Tenn. April 20, 2023).

Mother concedes that she "cannot in good faith" argue that she complied with the requirements of the permanency plan. She does, however, raise a procedural challenge to this ground for termination, asserting that she was not provided with a physical copy of the permanency plan. Pursuant the Tennessee Supreme Court's charge to this court to review each ground for termination,[10] despite the Mother's merits waiver, we, nevertheless, review the trial court's findings as to this ground as well as considering her procedural argument below.

With regard to the permanency plans, both the initial version and subsequent revisions, the trial court found that (1) the plans requirements were in the Children's best interests and reasonably related to the conditions that resulted in the Children being placed in foster care, (2) DCS explained and reviewed the plans with Mother, (3) Mother "has not substantially complied with the responsibilities and requirements set out for her in the permanency plans," (4) Mother "has not successfully completed a single action step on the plans," and (5) "DCS has proven, by clear and convincing evidence, the ground of substantial noncompliance with the permanency plan against" Mother.

The trial court repeatedly observed following the termination of Mother's trial home visit that two primary factors contributed to the Children's need for foster care: "drug use and housing instability." The permanency plan reasonably sought to address both of these concerns. Despite DCS's attempts to help Mother address her challenges with drugs and housing, Mother failed to take responsive action to meaningfully address these problems. As found by the trial court, Mother did not successfully complete even a single action step set forth in the permanency plans.

Mother, nevertheless, argues that this ground for termination is not satisfied because

---

[10] The Tennessee Supreme Court has observed that "issues not raised in the Court of Appeals generally will not be considered by this Court, [but] there are exceptions to this general rule." *In re Carrington H.*, 483 S.W.3d at 525. Creating one such exception, the Tennessee Supreme Court held "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *Id.* at 525-26. In other words, in parental termination cases in Tennessee "waiver does not apply in the context of either the grounds for termination or whether termination is in a child's best interest." *In re Aniyah W.*, No. W2021-01369-COA-R3-PT, 2023 WL 2294084, at *6 (Tenn. Ct. App. Mar. 1, 2023), *no perm. app. filed.*

DCS failed to provide her with a physical copy of the permanency plan. Mother provides no authority to support her contention that this ground for termination cannot be established by DCS if a physical copy of the permanency plan is not provided. The trial court found that DCS explained the permanency plan requirements to Mother and found that DCS explained and reviewed the revised plans with Mother. The record reflects that (1) DCS employees discussed the plan and revised versions with Mother on multiple occasions, (2) DCS repeatedly asked Mother to provide DCS with her physical address, (3) Mother consistently declined to provide her address to DCS, (4) DCS attempted to email the plan to Mother, and (5) Mother's counsel attended meetings where the plan was addressed and was provided copies thereof.

With regard to permanency plans for children in a foster care placement, "[e]ach party shall sign the statement and be given a copy of it." Tenn. Code Ann. § 37-2-403(a)(2)(A). Accordingly, Mother is entitled to a copy of the permanency plan. The General Assembly, however, has also expressly provided that the ground of termination for substantial noncompliance can be established "notwithstanding the failure of the parent to sign or to agree to such statement if the court finds the parent was informed of its contents . . . ." Tenn. Code Ann. § 37-2-403(a)(2)(C). This court has indicated that DCS must "demonstrate that the parent was aware of plan's requirements and either that the parent agreed to the plan or that the plan was approved by a court," *In Matter of C.A.T.*, No. 01-A-01-9510-JV00474, 1996 WL 257497, at *5 (Tenn. Ct. App. May 17, 1996), not that a physical copy needs to be shown to have been provided to the parent. This court also has previously suggested that counsel for a parent receiving a copy of a permanency plan can provide a basis for determining that the represented parent had notice of the requirements of a permanency plan. *In re Nicholas C.*, No. E2019-00165-COA-R3-PT, 2019 WL 3074070, at *14 (Tenn. Ct. App. July 15, 2019) (concluding that father did not establish failure to visit was not willful when he was charged with knowledge of steps in the permanency plan necessary for visitation).

In the present case, Mother declined to participate in the permanency plan formation and approval process. Her attorney did participate and received copies of the original plan and revised versions. DCS repeatedly asked Mother for her physical address, which she declined to provide. Nevertheless, DCS explained and reviewed with Mother the original plan and revised versions. While Mother was entitled to a copy of the permanency plan, we cannot conclude that under the circumstances of the present case the failure of DCS to establish that Mother received a physical copy of the plan bars a determination that she is in substantial noncompliance with the permanency plan. Accordingly, having reviewed both the merits and Mother's procedural argument, we conclude that the trial court did not err in determining that DCS established by clear and convincing evidence the ground for termination of substantial noncompliance with the permanency plan.

### E. Persistent Conditions

- 19 -

The trial court found that clear and convincing evidence established the ground of termination based upon persistent conditions. Parental rights may be terminated for the persistence of conditions when:

> (3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> > (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
> >
> > (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
> >
> > (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
>
> (B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard . . . .

Tenn. Code Ann. § 36-1-113(3)(A-B) (effective July 1, 2021, to Jun. 30, 2022).

The trial court found (1) that "it had been more than six months since the Court order was entered that placed the children into DCS custody, (2) "DCS removed the children from their home because of [Mother's] drug use and housing instability," (3) "[t]he conditions that led to the removal still persist: [Mother's] drug use and housing instability," (4) "[o]ther conditions in the home exist that in all reasonable probability. would lead to further neglect or abuse of the children: Ms. Brown is without legal means of income with which to support the children," (5) "[t]here is little chance that those conditions will be remedied soon so that the children can be returned safely to the home," and (6) "[c]ontinuation of the parent/child relationship greatly diminishes the children's chances of being placed into a safe, stable and permanent home."

While not contesting the trial court's determination as to continuing drug use, Mother argues that, given her failure to testify, DCS cannot establish where she lives and that she is homeless by clear and convincing evidence. Assuming arguendo that Mother is correct, the ground of persistent conditions would still be satisfied in connection with her

- 20 -

continuing drug abuse and failure to adhere to permanency plan expectations in terms of addressing her drug abuse. DCS did, however, present evidence that Mother had informed DCS that she was homeless on more than one occasion. It also presented evidence that she has consistently declined to provide any physical address to DCS. Nor did Mother meet expectations in terms of the parenting plan with regard to establishing stable housing. Accordingly, we cannot conclude that the trial court erred by determining that DCS established by clear and convincing evidence the ground for termination of persistent conditions.

### F. Failure to Manifest a Willingness and Ability to Assume Custody

Finally, the trial court found clear convincing evidence that Mother failed to manifest a willingness and ability to assume custody of the Children. To satisfy this ground, two prongs must be proven by clear and convincing evidence: (1) the parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. Tenn. Code Ann. § 36-1-113(g)(14); *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). The Tennessee Supreme Court has indicated the statute places a "conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id*. at 677. Failure of the parent to manifest either ability or willingness will satisfy the first prong. *Id*. "Ability focuses on the parent's lifestyle and circumstances," while willingness revolves around a parent's attempts "to overcome obstacles" preventing the parent from assuming custody. *In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at *6 (Tenn. Ct. App. Feb. 8, 2019). A parent's express desire to reunite with the child is insufficient to establish a willingness to assume custody. *See In re Nicholas C.*, 2019 WL 3074070, at *17. On the contrary, "[w]hen evaluating willingness, we look for more than mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). This court may instead consider "whether a parent has attempted 'to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child.'" *In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at *9 (Tenn. Ct. App. Apr. 17, 2019) (quoting *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019)). A failure to make efforts to overcome such obstacles "can undercut a claim of willingness." *Id*. As for the second prong, a substantial risk of harm requires "a real hazard or danger that is not minor, trivial, or insignificant" and requires the harm to be more than a "theoretical possibility" but to be "sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001); *see In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018).

The trial court found that Mother "has failed to manifest, by act or omission, an

- 21 -

ability and willingness to personally assume legal and physical custody or Financial responsibility of the children." The trial court also found that "[p]lacing the children in the Ms. Brown's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the children."

The trial court heard testimony that Mother did not have stable housing and continued to abuse drugs. The trial court also heard testimony that Mother failed to complete any steps of her permanency plan and failed to take advantage of facilitated opportunities to address her drug abuse and housing instability. Having heard the testimony and reviewed the documentary evidence, the trial court determined that Mother was continuing to abuse drugs, lacked housing stability, and was not addressing meaningfully either of these dangers for the Children should they reside with Mother. The record supports these conclusions. We cannot conclude that the trial court erred by determining that DCS established by clear and convincing evidence the ground for termination of persistent conditions.

V.

If a statutory ground for termination of parental rights has been shown by clear and convincing evidence, the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). The Tennessee Supreme Court has summarized the law regarding the best interest analysis as follows:

Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ."

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives

individualized consideration before fundamental parental rights are terminated.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017) (citations omitted).

The nonexclusive factors relevant to the best interest analysis are laid out in Tennessee Code Annotated section 36-1-113(i)(1):[11]

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

---

[11] "This court applies the versions of the parental termination statutes in effect on the date the petition was filed." *In re J.S.*, 2023 WL at *6.

- 23 -

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and

effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i) (effective July 1, 2021 to June 30, 2022).

The trial court concluded that seventeen of these twenty factors support terminating Mother's parental rights. The trial court found that (F), (G), and (M) were inapplicable. As to (M), while not stating that this factor favored terminating Mother's parental rights, the trial court did actually make specific adverse findings, expressing an extremely dim view of Mother's efforts to address the circumstances, conduct, and conditions that made an award of custody unsafe and not in the Children's best interests. We are uncertain of why the trial court regarded this factor as inapplicable, but based on the trial court's specific factual findings, factor (M) is not in any event favorable for Mother's position.

In assessing the best interest of the Children, the trial court, among its other findings, also determined that (1) Mother "has shown little or no genuine interest in the welfare of the children," (2) Mother "continues to make lifestyle choices that prevent her from being able to parent the children or to provide a home for the children," (3) "[t]wo of three children are placed in foster homes that wish to adopt them. The third child's placement is relatively new, and the foster parents have not had sufficient time to consider adoption," (4) "[t]he children have established a strong bond with the foster parents," and (5) "[t]he children need and deserve permanency."

Since many of these factors touch on similar factual predicates and involve similar issues, we group our discussion of the best interest factors "based on the overarching themes within the list of twenty factors" under the circumstances of the case. *In re Chayson D.*, 2023 WL 3451538, at *14. We consider first the Children's emotional needs. *See* Tenn. Code Ann. § 36-1-113(i)(A) (concerning the need for stability), (B) (concerning how changes in caretakers affect child wellbeing), (D) (concerning parent-child attachment), (E) (concerning visitation), (H) (concerning attachment to others), (I) (concerning relationships with others), (T) (concerning the parent's fitness and its corresponding impacts). The trial court properly determined that these factors support the termination of Mother's parental rights. Ruth B.'s foster care situation is a "thriving" one. She has bonded well with her foster family, and her foster family intends to both adopt Ruth B. and promote positive relationships with her siblings. Ms. Coen testified that Glenn B. and Alexander B. were also in positive foster environments and hoped that each would be adopted. Between the StepStone and Wayne Provision foster home placements, the testimony indicated that each child appears to be in a welcoming environment and is eligible for future adoption. By contrast, there is almost no evidence in the record suggesting the Children share a strong bond with Mother. As DCS points out, Mother consistently failed to visit the Children. The trial court, quite reasonably, concluded that separating the Children from the positive environments in which they are progressing most likely would negatively impact them.

- 25 -

We turn next to considerations the Children's physical environment and well-being. *See* Tenn. Code Ann. § 36-1-113(i)(N) (involving any abuse or neglect present in the parent's home), (O) (involving the parent's prior provision of safe and stable care to any child), (Q) (involving the parent's commitment to having a home that meets the child's needs), (R) (involving the health and safety of the home). The trial court properly determined that these factors support the termination of Mother's parental rights. The trial court had concluded that the Children were dependent and neglected when they lived with Mother. The record does not indicate that Mother had provided safe and stable care to the Children, and her ability to do so has not improved. The trial court determined and the record supports that Mother continued to abuse drugs and that her housing instability had not been resolved. The trial court concluded that returning the Children to Mother's custody comes with the risk of harm. Mother's physical environment stands in stark contrast to the Children's current physical environments. The combination of these factors weighs in favor of termination.

Next, we consider Mother's and DCS's efforts. *See* Tenn. Code Ann. § 36-1-113(i)(C) (involving the parent's continuity in meeting the child's needs), (J) (involving the parent's lasting adjustment of circumstances), (K) (involving the parent's use of available resources), (L) (involving DCS's reasonable efforts). The trial court properly determined that these factors support the termination of Mother's parental rights. Mother failed to complete even one goal of her permanency plan, and the testimony reflected little sustained effort by Mother toward remedying the problems that resulted in the Children being removed from her care and placed in foster care. Though she tried to enter inpatient treatment facilities, she either promptly voluntarily ceased attending or was involuntarily discharged by each. DCS endeavored to assist Mother, but she did not take advantage of the assistance that she was offered.

With regard to support and knowledge of the Children's needs, the trial court also properly found that these grounds support termination. Tenn. Code Ann. § 36-1-113(i)(S) (addressing parent providing more than token support); (P) (addressing parent's understanding of the child's needs). The trial court determined, and the record supports, that Mother provided no support to the Children and did not understand the Children's needs.

The trial court concluded that the best interest factors support termination by clear and convincing evidence. "While determination of the child's best interest may not be reduced to a simple tallying of the factors for and against termination, . . . especially considering the similarities between the factors, we cannot help but acknowledge the overwhelming sense that the [Children's lives] will not be improved by a reintroduction to Mother." *In re Chayson D.*, 2023 WL 3451538, at \*15 (citation omitted). There is no doubt that Mother faces daunting challenges. However, DCS met its burden of showing clear and convincing evidence supporting at least one ground for termination. Furthermore, clear and convincing evidence supports the conclusion that the best interests

of the Children favor terminating Mother's parental rights. Accordingly, we affirm the trial court's order terminating Mother's parental rights.

## VI.

In considering the arguments advanced on appeal and for the reasons discussed above, we affirm the judgment of the trial court. The costs of the appeal are taxed to the appellant, Erica B., for which execution may issue if necessary. The case is remanded for such further proceedings as may be necessary and consistent with this opinion.

_____
JEFFREY USMAN, JUDGE